IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS 102 EAST HOLLIS STREET, APARTMENT 3A/3R, NASHUA, NEW HAMPSHIRE, THE CURTILAGE SURROUNDING SAID PROPERTY, TO INCLUDE A WHITE BOX TRUCK AND PULL BEHIND FOREST RIVER CAMPER, DESCRIBED MORE FULLY IN ATTACHMENT A, AND THE PERSONS OF STEVEN "SQUIGGY" ACORN AND TRACEY PELLETIER** | Case No. 20- mj-191-01-AJ<br><br><br>**Filed Under Seal** |

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Richard Sprankle, Drug Enforcement Administration ("DEA") Task Force Officer (TFO), hereby being duly sworn, depose and state as follows:

## Preface

1. The following affidavit is furnished to support a search warrant for the following: (1) the persons of STEVEN "Squiggy" ACORN (DOB        970) and TRACEY PELLETIER (Date of Birth      86)**,** and (2) 102 East Hollis Street, Apartment 3A/3R, Nashua, New Hampshire, and the curtilage, otherwise described as the Target Residence more fully in Attachment A**.**

2. Based upon information obtained from a variety of sources, including a confidential source, physical surveillance, intercepted communications, and controlled purchases of drugs, I submit that there is probable cause to believe that ACORN and PELLETIER, and others known and unknown have committed or are believed to be committing offenses involving the sale, and possession with the intent to sell the controlled drugs, and conspiracy to commit this crime in violation of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841 (a)(1)(distribution of controlled substances); and, there is probable cause to believe that this illegal activity is being operated from 102 East Hollis Street, Apartment 3A, Nashua, New Hampshire.

## Background

3. I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA") and have been so employed since 2019. I am currently assigned to the

Manchester New Hampshire District Office. I am currently employed by the Nashua New Hampshire Police Department as a police officer since 2010. My duties and responsibilities as a DEA Task Force Officer include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

4. During my employment with DEA, as well as my time with the Nashua New Hampshire Police Department, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, fentanyl, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. I am also familiar with the use of cellular telephone technology generally and as it is used to facilitate drug trafficking offenses.

5. Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection of money that constitutes the proceeds of drug trafficking activities. I am familiar with the types of packaging used to distribute controlled substances as well as equipment used such as scales, bags, pill presses and cutting agents. I am also familiar with drug-related paraphernalia and the equipment used to ingest controlled substances, such as syringes and smoking pipes. I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations. Because of my training and experience, I am familiar with new trends of concealing illegal drug trafficking. I also stay current on the latest technology used to investigate drug crimes. In sum, through my training, education, and experience, I have become familiar generally with the manner in which drug traffickers conduct their illegal activities, including purchasing, manufacturing, storing, and distributing drugs, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and state and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains the material information I am aware of that is

pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## Target Premises

7. The Target Residence, 102 East Hollis Street, Nashua, New Hampshire is described as a multi-apartment building physically situated just west of the intersection of East Hollis Street and Arlington Street. The building has gray siding with the numbers "102" vertically affixed on the east side of the entry door. Apartment 3A is located on the second floor and is the first the apartment directly in front of the stair case. As part of this investigation, on August 6, 2020, Det. Hannigan responded to 102 East Hollis Street and took pictures of the location. Det. Hannigan entered into the common hallway, open for foot traffic, of the structure and took a picture of apartment 3A which had "3A" affixed to the door as well as "3R." 102 East Hollis Street includes a parking area on which are situated a camper and white box truck.

8. On March 1, 2020, investigators received information from a confidential source identifying STEVEN ACORN's apartment as 102 East Hollis Street, Apartment 3A. Detective Hannigan, of the Nashua Police Department, conducted further research utilizing an internal database and noted his local IMC record, based off previous contacts with the Nashua Police Department, lists ACORN's residence at 102 East Hollis Street Apartment 3A. Furthermore, after conducting a check through the New Hampshire Department of Motor Vehicles, ACORN is listed as residing at 102 East Hollis Street, Nashua, New Hampshire.

9. On August 5, 2020, Task Force Officer Sprankle requested an address verification of 102 East Hollis Street, Nashua, New Hampshire, from Inspector Doyle, of the United States Postal Inspection Service. TFO Sprankle specifically requested address verifications on Steven ACORN or his girlfriend Tracy PELLETIER and whether or not they were receiving mail at the listed address. Inspector Doyle received information back from the Nashua, NH, Post Office on August 19, 2020, which confirmed that ACORN and PELLETIER were receiving mail at 102 East Hollis Street, Nashua, NH in apartment 3R. Inspector Doyle completed a Memorandum of Activity.

10. Det. Hannigan researched Nashua Police Departments internal IMC database and identified Tracey PELLETIER (Date of Birth       86) of 102 East Hollis Street Apartment 3. Det. Hannigan also noted that PELLETIER was on parole, supervised out of the Exeter, NH field office. Upon contacting PPO Matthew Carroll, PELLETIER's Parole Officer, Det. Hannigan learned that PELLETIER reported her residence address as 102 East Hollis Street Apartment 3, Nashua, NH. Furthermore, PELLETIER is known to Det. Hannigan through police contacts to be ACORN's current girlfriend.

**Probable Cause**

### I.     Cooperator information

11. On August 21, 2019, the Nashua Police Department received cooperator information that STEVEN "Squiggy" ACORN (DOB       1970) was actively selling heroin/fentanyl within the city of Nashua.   The confidential source advised that ACORN supplied heroin/fentanyl to multiple individuals for redistribution.

12. On November 1, 2019, the Nashua Police Department received information from a second source that ACORN was actively selling heroin/fentanyl within the city of Nashua. This source described observing constant foot traffic coming to and from ACORN's apartment at all hours, and advised that these individuals are purchasing controlled substances.

13. On January 11, 2020, the Nashua Police Department received further information from a third source that ACORN was distributing heroin within the city of Nashua.  This source advised ACORN used "runners," other individuals, to make his deliveries and said that ACORN was selling large quantities of heroin.

14. On February 7, 2020, the Nashua Police Department received information from a fourth source describing frequent foot traffic in and out of ACORN's apartment. This source indicated that multiple people have approached the source inquiring where to find ACORN in order to purchase drugs from him.

15. On March 1, 2020, the Nashua Police Department received information from a fifth source describing constant foot traffic in and out of ACORN's apartment.  This source identified ACORN's apartment as 102 East Hollis Street, Apartment 3A.

16. On May 29, 2020, the Nashua Police Department received further information from a sixth source that ACORN was supplying multiple individuals with heroin within the city of Nashua. According to the source ACORN is a larger level heroin distributor.

17. On July 1, 2020, Det. Hannigan made contact with Nashua Police Cooperating Individual 20-31, hereafter referred to as CI. CI advised that ACORN is actively selling multiple "finger" (a common term used to describe a ten gram unit of heroin/fentanyl) quantities

of heroin/fentanyl out of his residence at 102 East Hollis Street. CI advised that CI has previously purchased heroin/fentanyl numerous times from ACORN and could purchase multiple "fingers" during a single transaction. CI has a criminal record including multiple misdemeanors, as well as felony reckless conduct ('04), sale of a narcotic drug ('04) and theft by unauthorized taking ('13). CI agreed to cooperate in exchange for potential consideration with respect to pending State drug charges.

## II.    **Controlled Buys**

18. During the ACORN investigation, and while utilizing cooperation from CI, law enforcement made a series of controlled buys from ACORN near his apartment located at the Target Residence. Prior to each controlled buy, law enforcement monitored or confirmed communication between CI and ACORN concerning the buys. Agents directed CI concerning the terms of each buy and provided CI with pre-recorded United States currency to complete the buy. Before each buy, agents searched CI for any unexplained cash, weapons or contraband. During each buy, agents utilized an electronic transmission and recording device to monitor and preserve evidence of contact between CI and ACORN. Before, during and after each buy, agents conducted surveillance to the extent feasible on CI, ACORN and the buy location. After each buy, agents conducted a search of CI's person for any unexplained cash, weapons or contraband. After each buy, agents debriefed CI-1 concerning the interactions with ACORN, and compared the debriefing with evidence derived from the electronic monitoring and surveillance. These controlled buys are summarized below:

### Buy #1:  July 2, 2020 (Acorn)

19. On July 2, 2020, under the direction of Det. Hannigan and in his presence, CI contacted ACORN via text message on his reported phone number of          8622 requesting to purchase a "finger" of heroin/fentanyl. Under Det. Hannigan's direction, CI went to 102 East Hollis Street, ACORN's residence. CI then proceeded to the rear of the building and met ACORN. While at the rear of the residence ACORN handed CI a baggie containing suspected 10 grams of heroin/fentanyl and in exchange CI gave ACORN the pre-recorded United States Currency. CI did not make contact with any other subject which was further confirmed through audio and video recordings maintained during the transaction.

### Buy #2- July 27, 2020 (Acorn)

20. On July 27, 2020, under Det. Hannigan's direction and in his presence, CI contacted ACORN via telephone requesting to purchase 3 "fingers" of heroin. ACORN directed CI to meet at ACORN's residence, 102 East Hollis Street. Under Det. Hannigan's direction, CI went to 102 East Hollis Street. CI then went to the rear of the building and met ACORN, at which point they both entered into ACORN'S camper located approximately 10

feet from 102 East Hollis Street. While in the camper ACORN gave CI-1 suspected 30 grams of heroin/fentanyl and in exchange CI handed ACORN the pre-recorded United States currency. CI did not make contact with any other subject which was further confirmed through audio and video recordings maintained during the transaction.

### Buy #3 – August 20, 2020 (Acorn)

21. On August 20, 2020, in anticipation of a controlled purchase and in Det. Hannigan's presence CI made contact with ACORN via text message and asked if he could come to the residence. ACORN agreed and told CI to "come over." At Det. Hannigan's direction, CI went to 102 East Hollis Street. Prior to CI's arrival, Det. Murray observed ACORN pacing back and forth in the back parking lot of the residence, near a white Mercedes, bearing NH registration        96. At one point, ACORN opened the door to the Mercedes and reached inside. Upon closing the door, he walked back towards the camper parked within approximately 10 feet of the listed address. ACORN then returned to the back of the lot and walked down a hill to a white box truck, which was still on the property and in close proximity to 102 East Hollis Street. After he opened and closed the truck door, ACORN proceeded to walk back up the hill to return to the area of the camper. ACORN went behind several vehicles and appeared as if he entered into the camper. ACORN reappeared into the lot and paced as he used a cell phone while looking around the immediate area as if he was expecting someone to arrive. Shortly after, Det. Murray observed CI arrive at the parking lot and walk to the area of the camper out of Det. Murray's view. After a short period, CI emerged and departed while under constant surveillance back to Det. Hannigan. After CI left the area of 102 East Hollis Street, Det. Murray observed ACORN emerge from the area of the camper and walk back to the parking lot. ACORN appeared to look under the front of the Mercedes and reach underneath. ACORN then returned to the camper and residence out of Det. Murray's view.

22. CI informed Det. Hannigan that after leaving him, CI travelled directly to ACORN's residence and went to the rear of the building where the CI made contact with ACORN inside the camper. CI advised that ACORN weighed and gave him 50 grams of suspected heroin/fentanyl and in exchange, the CI handed ACORN the pre-recorded United States Currency. Det. Hannigan subsequently conducted a field test on the suspected drugs, which bore a positive reaction for fentanyl.

### Buy #4 – October 8, 2020 (Pelletier)

23. On October 7, 2020, CI told Det. Hannigan that Tracey PELLETIER is actively selling heroin/fentanyl at 102 East Hollis Street. CI advised that CI contacts PELLETIER via telephone (         2003) to arrange drug deals, and PELLETIER then directs CI to an area near her residence at 102 East Hollis Street to complete the transactions. The

aforementioned phone number provided to Det. Hannigan by CI was listed to Tracey PELLETIER in internal Nashua Police Department records.

24. On October 8, 2020, under Det. Hannigan's direction and in his presence, CI called PELLETIER at phone number         2003 and requested 10 grams of heroin from PELLETIER. PELLETIER replied she was "good" and to come to her residence. As Det. Hannigan's instructed, CI responded to 102 East Hollis Street and entered into the common area where CI provided PELLETIER with pre-recorded United States currency. PELLETIER took the money and left to what was believed to be her apartment before returning and providing CI with approximately 10 grams of suspected heroin/fentanyl. CI then left the building and returned to Det. Hannigan.

### Buy #5 – October 13, 2020 (Pelletier)

25. On October 13, 2020, under Det. Hannigan's direction and in his presence, CI called PELLETIER at phone number         2003 and asked to purchase "3," meaning 30 grams of heroin from PELLETIER for $900. PELLETIER responded, "ok" and told CI to come to her residence. Under Det. Hannigan's direction, CI responded toward 102 East Hollis Street, but on the way PELLETIER called and told CI to meet at Speedway Gas Station at 79 East Hollis Street. Det. Hannigan observed PELLETIER leaving 102 East Hollis Street and make contact with CI on East Hollis Street. CI gave PELLETIER the pre-recorded United States currency and PELLETIER provided CI with approximately 10 grams of suspected heroin/fentanyl. CI noted the discrepancy and PELLETIER went back to 102 East Hollis Street to obtain the remaining quantity. PELLETIER returned a short time later and made contact with CI at Nashua Laundry, 105 East Hollis Street, where she provided CI with approximately 10 more grams of heroin/fentanyl, now totaling 20 grams of heroin. PELLETIER told CI that CI would have to come back for the remaining 10 grams at a later time. PELLETIER subsequently returned a sum of currency to CI for the remaining 10 grams that was not provided and walked back to 102 East Hollis Street. After the deal, CI returned to Det. Hannigan and relinquished the suspected heroin/fentanyl. Det Hannigan subsequently field tested the suspected drugs, which was positive for fentanyl.

### Buy #6 – October 14, 2020 (Pelletier)

26. On October 14, 2020, under Det. Hannigan's direction and in his presence, CI called PELLETIER at phone number         2003 to buy 10 grams of heroin/fentanyl from PELLETIER. PELLETIER told CI to meet her at laundromat at the laundromat at 105 East Hollis Street. Surveillance observed PELLETIER leave 102 East Hollis Street and enter the laundromat. As instructed by Det. Hannigan, CI went to the laundromat to meet PELLETIER. In the laundromat, CI made contact with PELLETIER and handed her the pre-recorded United States currency. PELLETIER then returned to 102 East Hollis

Street for several minutes before walking back to the laundromat. Upon entering, PELLETIER gave CI a baggie containing approximately 10 grams of suspected heroin/fentanyl. Afterwards, PELLETIER left the laundromat and returned to 102 East Hollis Street. CI met with Det. Hannigan and relinquished the suspected drugs.

### Additional surveillance of 102 East Hollis Street

27. On October 19, 2020, Det. Hannigan conducted surveillance of 102 East Hollis Street. At approximately 5:43pm, two (2) older Caucasian males entered the primary entry to 102 East Hollis Street on the south-side of the apartment dwelling, exiting approximately ten (10) minutes later. A white Mercedes sedan consistent with the vehicle owned and operated by Steven ACORN (NH registration          6) was observed idling in the rear parking lot of                        At approximately 6:15pm, Det. Hannigan observed a male known to Det. Hannigan as Luis ESCALERA (Date of Birth:         1983) and Steven ACORN exit                       utilizing the main entry. Investigators believe ESCALERA resides at                              Members of the Nashua Police Department have received cooperator information and tips reporting that ESCALERA is involved in the sale of narcotics throughout the city of Nashua A report to officers on March 1, 2020 indicated that ESCALERA was selling narcotics out of                     during evening hours.

28. After exiting the main entryway, ESCALERA and ACORN walked toward a small alley which accesses the rear parking lot, where they were temporarily out of view. Det. Hannigan then observed both ESCALERA and ACORN situated within ESCALERA's Audi sedan (NH          as it exited the rear of                    toward East Hollis Street. Det. Hannigan then observed a tall Caucasian male with a Boston Celtics hooded sweatshirt run toward the Audi sedan and temporarily engaged ESCALERA at the driver's window with ACORN in the passenger seat. This male then separated from the vehicle and it entered into traffic along East Hollis Street. Given the observations and the involved participants, the interaction between the occupants of the Audi sedan and the Caucasian male were consistent with a street-level narcotics transaction. Furthermore, given the information of ACORN being involved with drug sales from this location, detectives reasonably believe ACORN was involved in this possible street level transaction due to his position immediately next to ESCALERA in the aforementioned vehicle.

### Conclusion

26 Based on these facts described above, I believe that there is probable cause that the Target Residence, including its curtilage, contains controlled substances, cash, money orders, or other items described in Attachment A that constitute fruits, evidence or instrumentalities of drug trafficking in violation of Title 21, United States Code, Sections

841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute and distribution of controlled substances).  Accordingly, I respectfully request that this Court issue a search warrant authorizing the search of the persons of STEVEN "Squiggy" ACORN (DOB      970) and TRACEY PELLETIER  (Date of Birth      86), and the TARGET PREMISES for the items described in Attachment B.

/S/ Richard Sprankle
Richard Sprankle
Drug Enforcement Administration/Task Force Officer

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: Oct 26, 2020
Time: 5:17 PM, Oct 26, 2020

/s/ Andrea K. Johnstone
HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

## **PREMISES TO BE SEARCHED**

The premises to be searched include:

1. the residential property located at 102 East Hollis Street, Apartment 3A/3R, Nashua, New Hampshire, including curtilage surrounding said property, (the TARGET PREMISES);

2. one Generic White "tt unit" box truck; and

3. one white with tan trim, Forest River, pull behind "rockwood roo" trailer; and

4. the persons of STEVEN "SQUIGGY: ACORN and TRACEY PELLETIER.

The SUBJECT PREMISES includes the apartment building and the curtilage area around the building on which are situated the box truck and trailer. The following photographs depict the SUBJECT PREMISES, the box truck and trailer.









## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Controlled substances including, but not limited to fentanyl;

2. Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3. Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors and devices used to store surveillance footage, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

4. Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic / digital media) and iPads, electronic devices, personal computers and all objects capable of storing financial digital data in any form used or believed to be used by ACORN, PELLETIER, or co-conspirators;

5. Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6. Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7. Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2012 to the present;

8. Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, jewelry, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9. Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

13. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning ACORN and/or PELLETIER, or co-conspirators;

14. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

15. Cellular telephones, to include telephones associated with numbers 978-337-8622 and 603-391-2003. I seek to search such telephones for:

    a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

    d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

    e. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

  f. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

  g. all bank records, checks, credit card bills, account information, and other financial records; and

  h. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

  I seek authority to seize other telephones in the premises that are believed to be used by these targets or co-conspirators but will seek further authority before conducting searches of those devices. Investigators will not seize cellular telephones determined to belong to third parties who may be present in these residences but who are not co-conspirators. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.